NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (4th) 200545-U

NO. 4-20-0545

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 26, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.A., a Minor | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
|     Petitioner-Appellee, | ) | No. 17JA57 |
|     v. | ) | |
| Ernest A., | ) | Honorable |
|     Respondent-Appellant). | ) | John C. Wooleyhan, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices DeArmond and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding the trial court's fitness finding was not against the manifest weight of the evidence.

¶ 2    In July 2019, the State filed a petition to terminate the parental rights of respondent, Ernest A., as to his minor child, A.A. (born November 7, 2013).  Following a fitness hearing, the trial court found respondent unfit.  In October 2020, the court found it was in A.A.'s best interest to terminate respondent's parental rights.

¶ 3    Respondent appeals, arguing the trial court erred by finding him unfit due to a failure to make reasonable progress toward the return of the child during a nine-month period after the initial nine-month period following an adjudication of neglect.  For the following reasons, we affirm the trial court's judgment.

¶ 4                                        I. BACKGROUND

¶ 5                                    A. Initial Proceedings

¶ 6         In August 2017, the State filed petitions for adjudication of wardship, alleging

A.A. and his brother, J.S., were neglected pursuant to the Juvenile Court Act of 1987 (Juvenile

Court Act) (705 ILCS 405/2-3(1) (West 2016)), in that J.S. was born at 31 weeks' gestation,

respondent mother was "unable to provide for the minor's feeding, diapering, clothing[,] and

other needs as a premature infant, even with prompting and reminders from hospital staff."  The

petition further alleged respondent father Damon S. had not been active in caring for J.S.,

respondent mother had a history of untreated mental health issues, and there was a prior intact

case involving the same caregiving concerns when A.A. was born.

¶ 7         In May 2018, the trial court held an adjudicatory hearing.  Kari Blickhan, a child

protection investigator with the Department of Children and Family Services (DCFS), testified

she met with respondent and explained A.A. was being taken into protective custody because of

the concerns over respondent mother's ability to care for J.S.  When Blickhan took A.A. into

protective custody, he was in respondent's care and she testified, "He did appear dirty.  He had

black on the bottom of his feet and underneath his toenails.  He also had a foul odor to him."

According to Blickhan, when respondent was informed A.A. was being taken into protective

custody, he stated he understood and immediately began to get A.A. ready to leave.  The court

entered an order finding the minor neglected.  In June 2018, the court entered a dispositional

order (1) finding respondent unfit and unable to care for the minor, (2) making the minor a ward

of the court, and (3) placing custody and guardianship of the minor with DCFS.

¶ 8                                    B. Termination Proceedings

¶ 9         In July 2019, the State filed a motion for the termination of parental rights,

alleging respondent failed to (1) make reasonable efforts to correct the conditions that were the

basis for the removal of the children and (2) make reasonable progress toward the return of the minor within any nine-month period after the adjudication of neglect. The State alleged the following three specific nine-month periods: (1) May 11, 2018, to February 10, 2019; (2) February 11, 2019, to November 10, 2019; and (3) September 27, 2019, to June 26, 2020.

¶ 10　　　　In June 2020, the matter proceeded to a hearing on the motion for termination of parental rights. At the outset of the hearing, the trial court took judicial notice of its own records showing that visitation with respondent was suspended in September 2018. Further, the court took judicial notice of the fact respondent never had unsupervised, overnight, or extended visitation. The court heard the following evidence.

¶ 11　　　　　　　　　　　　　1. *Deb Roberts*

¶ 12　　　　Deb Roberts, the director of the foster care program at Chaddock, testified she supervised three caseworkers on the case. Roberts laid the foundation for the integrated assessment and the service plan. According to Roberts, the assessment recommended habilitation services because, although stable, the family's house was inappropriate for the children.

¶ 13　　　　　　　　　　　　2. *Gina Aschemann*

¶ 14　　　　Gina Aschemann, a former child welfare specialist with Chaddock, testified she was assigned the case in September 2018. In December 2018, a service plan assigned various tasks to respondent to complete, including parenting classes, seeking employment, maintaining adequate housing, completing mental health services, and cooperating. Respondent was rated unsatisfactory as to cooperation because Aschemann was unable to make contact with him until March 2019. According to Aschemann, respondent failed to contact Chaddock and she did not

have a phone number for him until she saw him in court. Respondent's service plan specifically obligated him to keep Chaddock and his caseworker updated with current contact information.

¶ 15    Respondent was rated unsatisfactory on his parenting task because he failed to complete the parenting program. At the time Aschemann received the case, visitation between A.A. and respondent had been suspended. Aschemann referred respondent to a supplemental parenting program, which he failed to complete. Respondent was referred for a mental health evaluation, and he attended the first appointment. The service provider indicated they were unable to provide respondent services because he was very angry and not forthcoming with information.

¶ 16    Aschemann testified she visited respondent in May 2019, his home was cluttered, and he had an aggressive dog. According to Aschemann, respondent and his paramour were waiting for the Quincy police to arrive due to a complaint about the dog. Aschemann asked respondent about his unsuccessful discharge from services through Hobby Horse, and respondent shut down. According to Aschemann, respondent's paramour spoke for him the rest of the visit.

¶ 17    A June 2019 service plan continued to task respondent with cooperating, maintaining adequate housing, completing parenting classes, and obtaining mental health services. Respondent was rated unsatisfactory regarding mental health services. His therapist was unable to provide services to him because he was uncooperative and exhibited an unwillingness to engage during the initial evaluation. According to Aschemann, respondent was rated unsatisfactory as to housing because he moved and failed to provide information about where or with whom he lived. Respondent was rated unsatisfactory for cooperation because his meetings with Aschemann were adversarial. Aschemann testified respondent would give her very short answers and when she tried to provide him with information, he would continue to

state he would talk to his lawyer to get visitation with A.A. Respondent was rated unsatisfactory regarding parenting because he failed to complete his second referral to the parenting class, even though the service provider gave him one-on-one coaching and workbooks with a simplified version of the class.

¶ 18                                    3. *Stacy Bucher*

¶ 19            Stacy Bucher, a child welfare specialist with Chaddock, testified she was assigned the case in July 2019. According to Bucher, the same service plans remained in effect in January 2020. At that time, Bucher rated respondent unsatisfactory for housing because he never contacted her or Chaddock, and she did not know where he lived. Respondent was rated unsatisfactory for parenting, cooperation, and mental health services because he never made contact or engaged in services.

¶ 20            In February 2020, Bucher met with respondent at his apartment. Respondent was not employed but helped his cousin deliver newspapers. At that time, respondent was not engaged in any services, and Bucher discussed getting him involved in services. Respondent did not indicate he had any difficulty accessing services, nor did he ask about A.A. Bucher had respondent sign a release for mental health services through Transitions, and respondent agreed to initiate services. Respondent never provided proof he followed up with another intake or evaluation.

¶ 21            In June 2020, Bucher rated respondent unsatisfactory for housing, parenting, cooperation, and mental health services. Bucher was unable to verify the address she received, and respondent never returned her calls. Respondent made no contact with Bucher about any services, and he did not engage in any services.

¶ 22                                    4. *Trial Court's Order*

¶ 23       Following the fitness hearing, the trial court held a separate best-interest hearing. In October 2020, the court entered an order finding respondent unfit due to his failure to (1) make reasonable efforts to correct the conditions which were the basis for the removal of the child or (2) make reasonable progress toward the return of the child to the parent within a nine-month period after the adjudication of neglect. The court further found it was in the best interest of the child to terminate respondent's parental rights.

¶ 24       This appeal followed.

¶ 25                              II. ANALYSIS

¶ 26       On appeal, respondent argues the trial court erred by finding he failed to make reasonable progress toward the return of the child during a nine-month period after the initial nine-month period following an adjudication of neglect.

¶ 27       In a proceeding to terminate parental rights, the State has the burden of proving parental unfitness by clear and convincing evidence. *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004). In making such a determination, the court considers whether the parent's conduct falls within one or more of the unfitness grounds described in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). Evidence supporting a finding of unfitness on any ground enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) is enough to sustain a finding of unfitness, even where the evidence may not support an unfitness finding on another ground. *In re C.W.*, 199 Ill. 2d 198, 210, 766 N.E.2d 1105, 1113 (2002). A reviewing court will not overturn the trial court's finding of unfitness unless it is against the manifest weight of the evidence. *Jordan V.*, 347 Ill. App. 3d at 1067. The trial court's decision is given great deference due to "its superior opportunity to observe the witnesses and evaluate their credibility." *Id.*

¶ 28    In this case, the State alleged respondent was unfit on two grounds: he failed to (1) make reasonable efforts to correct the conditions that were the basis for the removal of the minor and (2) make reasonable progress toward the return of the minor within any nine-month period after the adjudication of neglect. The State alleged the following three specific nine-month periods: (1) May 11, 2018, to February 10, 2019; (2) February 11, 2019, to November 10, 2019; and (3) September 27, 2019, to June 26, 2020. The trial court found respondent unfit based on the allegations in the State's petition.

¶ 29    On appeal, respondent contends the trial court's finding of unfitness was against the manifest weight of the evidence. We may affirm on any basis in the record, and we need not review all the grounds for a finding of unfitness if we uphold the trial court's findings as to one ground of unfitness. See *In re D.H.*, 323 Ill. App. 3d 1, 9, 751 N.E.2d 54, 61 (2001). As we find the trial court's finding as to reasonable progress dispositive, we begin there.

¶ 30    The trial court's finding that respondent failed to make reasonable progress toward the return of A.A. within the following three specific nine-month periods: (1) May 11, 2018, to February 10, 2019; (2) February 11, 2019, to November 10, 2019; and (3) September 27, 2019, to June 26, 2020, was not against the manifest weight of the evidence. Reasonable progress is measured by an objective standard that considers the progress made toward the goal of returning the child to the parent. *In re M.A.*, 325 Ill. App. 3d 387, 391, 757 N.E.2d 613, 617 (2001). Specifically, reasonable progress includes a parent's compliance with service plans and court directives, in light of the condition that gave rise to the removal of the child. *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001).

¶ 31    Here, respondent's service plan required him to successfully complete numerous tasks, including proving adequate housing, completing mental health services, cooperating with

- 7 -

Chaddock, and completing parenting classes. Respondent was rated unsatisfactory for housing because he failed to provide the caseworkers with current information about his living situation. Aschemann testified she did visit respondent at his home once and the home was cluttered and they had an aggressive dog. In fact, the day Aschemann visited, respondent and his paramour were waiting for the police to arrive regarding a complaint about the dog. Moreover, the majority of the time the caseworkers had no information about where respondent was living and did not receive an answer when they knocked on the door of respondent's last known address.

¶ 32    As for mental health services, the record shows respondent attended an initial mental health evaluation and was aggressive and not forthcoming to the extent that the service provider refused to provide additional services. The record shows respondent failed to cooperate with Chaddock in initiating services or providing caseworkers with necessary information. Respondent was also rated unsatisfactory for parenting because he failed to complete his second referral to the parenting class, even though the service provider gave him one-on-one coaching and workbooks with a simplified version of the class.

¶ 33    Respondent argues the State failed to prove respondent was unfit because it failed to demonstrate A.A. should not have been placed with respondent from the outset. However, respondent did not appeal the adjudicatory and dispositional findings in this case. Moreover, we are convinced the State would have met its burden with regard to those findings. A.A. was taken from respondent's care into protective custody, and Blickhan testified he was dirty and had a foul odor. Additionally, the conditions respondent mother was living in and exposing A.A. to were filthy, and respondent apparently did not object to those conditions. Respondent argues A.A. should have been placed with him so he could have had the opportunity to "rise to the occasion"

to raise A.A. As stated, respondent failed to challenge the adjudicatory and dispositional findings.

¶ 34    When respondent was given the opportunity to "rise to the occasion" by cooperating with Chaddock and completing the necessary services, respondent failed to do so. Respondent failed to keep in contact with the caseworkers, engage in mental health services, and complete parenting classes. Based upon our review of the record, we cannot say the trial court's fitness finding was against the manifest weight of the evidence. Respondent does not challenge the court's best-interest finding. Accordingly, we affirm the judgment of the court.

¶ 35                III. CONCLUSION

¶ 36    For the reasons stated, we affirm the trial court's judgment.

¶ 37    Affirmed.